UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARQUES S. REED, *individually and as Administrator or Executor of the estate of Sharon Reed*,

Plaintiff,

-v-

FRIEDMAN MANAGEMENT CORP., et al.,

Defendants.

11-CV-7547 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In 2011, the since-deceased Sharon Reed and her son, Marques S. Reed (together, "the Reeds"), filed a *pro se* complaint against Friedman Management Corp., David DaSilva, and Viclar Realty Corp. (collectively, "Defendants"), which this Court has construed as alleging that Defendants committed racial discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, by subjecting the Reeds to substandard housing conditions and eventual eviction. (Dkt. No. 1.) After years of discovery, Defendants have filed a motion for summary judgment. (Dkt. No. 241.) For the following reasons, Defendants' motion is granted.

I.  Background

This case's long journey began on October 25, 2011, when Sharon Reed and her son, Marques S. Reed, filed a *pro se* complaint against Defendants. (Dkt. No. 1 ("Compl.").) The complaint alleged that the Reeds had been living in a Manhattan apartment with Sharon Reed's father, Henry Frazier, from at least 2008 to 2010, but that their right to continued occupancy fell

1

into dispute after Frazier's death in August 2010.[1] (Compl. ¶¶ 4–5, 16.) According to the Reeds, their landlord, Defendant Viclar Realty Corp. ("Viclar"), had issued them an eviction notice in November 2010 and, after a period of back-and-forth in state housing court, had successfully "put [them] out of [their] home."[2] (Compl. ¶ 22; *see also* Compl. ¶ 16; Dkt. No. 243-3 at 2–3.) The eviction, the Reeds maintained, was reflective of how Viclar and its management company, Defendant Friedman Management Corp. ("Friedman"), "ha[d] been doing business with black people for years." (Compl. ¶ 24.) Indeed, the Reeds went on, Viclar and Friedman, at times acting through Friedman's agent, Defendant David DaSilva, had engaged in many discriminatory acts against them over the years, such as failing to fix their broken refrigerator, depriving them of heat and hot water, maintaining their door frame in unsafe conditions, and overlooking harassment that they were suffering at the hands of Frazier's girlfriend, Alma Wilson, who also occupied the apartment. (Compl. ¶¶ 7, 14–15, 21, 24; *see also* Dkt. No. 243-26 at 14:25–15:16.)

In an April 12, 2012 memorandum and order, this Court dismissed the complaint with prejudice. *Reed v. Friedman Mgmt. Corp.* ("*Reed I*"), No. 11 Civ. 7547, 2012 WL 1267972, at *4 (S.D.N.Y. Apr. 12, 2012). The Court construed the complaint as invoking the FHA's protections against racial discrimination but concluded that the complaint's factual allegations failed to state a plausible claim to relief under the FHA and that any such claim would in any

---

[1] In his deposition testimony, Marques Reed clarified that he lived at the apartment continuously from 2003 to 2011 and that his mother, Sharon Reed, lived at the apartment "off and on" during 2008 and 2010. (Dkt. No. 243-26 at 14:9–11, 16:13–18:18.)

[2] The record reflects that the housing-court litigation ended in a September 27, 2011 settlement agreement, pursuant to which the Reeds acknowledged Viclar's ownership of the apartment and Viclar granted the Reeds the right to continued occupancy until December 31, 2011. (Dkt. No. 243-3 at 12.) Marques Reed acknowledges the settlement agreement but maintains that he and his mother entered into the agreement only "out of fear" of the housing-court judge who had "[s]cared the crap out of [them]." (Dkt. No. 243-26 at 42:2–14.)

event have been barred by the preclusive effect of the earlier housing-court litigation. *Id.* at *1–3. The Second Circuit, however, vacated the dismissal on appeal, holding that the prior housing-court litigation did not preclude the Reeds from asserting an FHA claim in this Court and that dismissal should therefore have been without prejudice. *Reed v. Friedman Mgmt. Corp.*, 541 F. App'x 40, 41 (2d Cir. 2013) (summary order).

After the case returned to this Court on remand, the Reeds filed an amended complaint that raised no new allegations against Defendants but that elaborated on the Reeds' claimed injuries. (Dkt. No. 20.) Defendants again moved to dismiss (Dkt. No. 30), but this time the Court denied the motion, *Reed v. Friedman Mgmt. Corp.* ("*Reed II*"), No. 11 Civ. 7547, 2014 WL 3300022, at *3 (S.D.N.Y. July 8, 2014). While acknowledging that the amended complaint "d[id] not materially differ from the original complaint," the Court found compelling grounds for revisiting its prior ruling that the complaint failed to satisfy the minimum threshold for *pro se* FHA claims and so ordered that the case proceed to discovery. *Id.* at *2.

Defendants then answered the amended complaint (Dkt. No. 40), and the Court referred the action to Magistrate Judge Gabriel Gorenstein for general pre-trial proceedings (Dkt. No. 44).[3] Following a January 16, 2015 conference (Dkt. No. 78),[4] Judge Gorenstein entered a schedule pursuant to which discovery was to be completed by April 30, 2015 (Dkt. No. 74).

Things, however, did not keep to plan. After the Reeds twice failed to meet court-imposed deadlines for responding to Defendants' discovery requests (Dkt. Nos. 93, 103),[5] Judge

---

[3] Sharon Reed requested that the case be assigned to a different magistrate judge (Dkt. Nos. 48, 50), but both this Court and Judge Gorenstein denied her requests (Dkt. Nos. 49, 51).

[4] The conference had initially been scheduled for October 30, 2014, but the Reeds failed to appear on that date. (Dkt. No. 53.) Although Judge Gorenstein ordered the Reeds to show cause for their nonappearance (*id.*), only Marques Reed attempted to do so (Dkt. Nos. 54–55).

[5] The Reeds missed the original March 6, 2015 deadline for responding to Defendants' discovery requests (Dkt. No. 93), and Judge Gorenstein ordered the Reeds to show cause for that

Gorenstein entered an order on May 21, 2015 staying discovery and inviting Defendants to seek sanctions pursuant to Federal Rule of Civil Procedure 37 (Dkt. No. 105). Taking up this invitation, Defendants again sought dismissal of the Reeds' complaint. (Dkt. Nos. 108–09.) Due to "problems with [D]efendants' [initial] discovery requests," though, Judge Gorenstein instead ordered Defendants to serve revised requests, which the Reeds would have until September 25, 2015 to answer (Dkt. No. 138 at 12). After this deadline came and went (Dkt. No. 151), Judge Gorenstein extended the deadline (Dkt. No. 153), but the new deadline passed, too (Dkt. No. 157). At that point, on November 12, 2015, Judge Gorenstein issued an order giving the Reeds "one final opportunity" to comply. (Dkt. No. 159.)

That order did the trick, sort of. On November 30, 2015, the Reeds finally served their discovery responses. (Dkt. Nos. 162–65.) But while the Reeds provided a few documents, they refused to provide others. (Dkt. Nos. 162, 165.) And although the Reeds responded to Defendants' interrogatories by identifying four witnesses—Al Sharpton, then-Congressman Charles Rangel, an unnamed superintendent, and an unnamed worker who took the Reeds' apartment keys when they moved out—they did not provide all the information necessary for Defendants to contact or identify these witnesses. (Dkt. Nos. 163–64; *see also* Dkt. No. 166.) After Judge Gorenstein ordered the Reeds to correct these deficiencies (Dkt. No. 168 at 2–3), Marques Reed provided further information about the witnesses (Dkt. No. 169) and, after some prompting (*see* Dkt. Nos. 170, 172), a few additional documents (Dkt. No. 179). But in light of Sharon Reed's failure to comply and Marques Reed's failure to justify his delayed compliance,

---

lapse (Dkt. No. 95). The Reeds responded to Judge Gorenstein's order (Dkt. No. 98), and Judge Gorenstein—despite finding the Reeds' explanation wanting—gave them "one additional opportunity" to serve their discovery responses, with a new deadline of May 7, 2015 (Dkt. No. 99). By May 13, 2015, though, the Reeds still had not served any responses. (Dkt. No. 103.)

Judge Gorenstein issued a March 11, 2016 order precluding the Reeds from offering any documents not already in the record as evidence in the litigation. (Dkt. No. 180.)

Soon thereafter, sad circumstances occasioned further delay. After failing to appear for a March 21, 2016 deposition (Dkt. No. 184), Marques Reed revealed that Sharon Reed was at that time "in her final[] stages of breast cancer" (Dkt. No. 186). Judge Gorenstein issued an April 18, 2016 order staying proceedings (Dkt. No. 189), and on June 24, 2016, Defendants wrote to inform Judge Gorenstein that Sharon Reed had passed away a few days prior (Dkt. No. 196). Understandably preoccupied, Marques Reed fell out of communication until January 6, 2017, at which point he filed a letter that revived the case. (Dkt. No. 200; *see also* Dkt. No. 197.) Over the course of the next several months, Marques Reed went about satisfying the preconditions for representing Sharon Reed's estate in this litigation (*see* Dkt. Nos. 203, 206–12, 215) and for doing so *pro se* (Dkt. Nos. 226–27).

With the case thus back on track, Judge Gorenstein lifted the discovery stay on March 26, 2018. (Dkt. No. 230.) Defendants took Marques Reed's deposition on June 5, 2018 (Dkt. Nos. 236, 243-26), and this case's protracted discovery period drew to a close (*see* Dkt. No. 235). Shortly thereafter, Defendants filed a motion for summary judgment. (Dkt. No. 241.)

The Court now turns to the merits of Defendants' motion.

**II.    Legal Standard**

Under Federal Rule of Civil Procedure 56, a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine dispute exists if, "viewing the record as a whole in the light most favorable to the nonmoving party, a rational trier of fact could not find for the nonmoving party." *United States v. Ogonoski*, 149 F. App'x 24, 25 (2d Cir. 2005) (summary order). Merely "rais[ing] 'metaphysical doubt' as to the

5

material facts" is insufficient to create such a dispute. *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, once the movant has pointed out that there is an "absence of evidence" to support the nonmovant's position on an issue as to which the nonmovant bears the burden of proof, *Feurtado v. City of New York*, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), "the nonmoving party must come forward with specific facts supported by sufficient concrete probative evidence to allow a rational trier of fact to find for her," *Ogonoski*, 149 F. App'x at 25.

**III. Discussion**

The Reeds' sole remaining claim in this litigation is a claim of racial discrimination under the FHA. *Compare Reed I*, 2012 WL 1267972, at *4 (dismissing all claims), *with Reed II*, 2014 WL 3300022, at *2 (reviving only the FHA claim). The FHA prohibits, among other things, "mak[ing] unavailable or deny[ing] a dwelling to any person because of race," 42 U.S.C. § 3604(a), or "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race," *id.* § 3604(b). As relevant here, FHA discrimination claims can proceed on a theory of intentional discrimination, *i.e.* disparate treatment, or on a theory of disparate impact.[6] *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016). The Court addresses each theory of liability in turn.

---

[6] The FHA, as amended, also allows plaintiffs to seek relief on a theory that the defendant failed "to make reasonable accommodations for the disabled." *Quad Enters. Co. v. Town of Southold*, 369 F. App'x 202, 205 (2d Cir. 2010) (summary order). While the Reeds have periodically alluded to their medical conditions (*see, e.g.*, Dkt. No. 20 at 5; Dkt. No. 50), they have produced no evidence that they were "disabled within the meaning of the FHA" during the time they lived in the apartment at issue here, let alone that Defendants "knew or should have known of" any disability or that Defendants refused to make any specific requested accommodation, *Martinez ex rel. Martinez v. Lexington Gardens Assocs.*, 336 F. Supp. 3d 270, 277 (S.D.N.Y. 2018).

### A. Disparate Treatment

To establish disparate treatment under the FHA, "a plaintiff can either produce direct evidence of discriminatory intent or indirect evidence that creates an inference of discriminatory intent." *Khodeir v. Sayyed*, No. 15 Civ. 8763, 2016 WL 5817003, at *5 (S.D.N.Y. Sept. 28, 2016). Under the burden-shifting framework applicable to indirect evidence, a plaintiff must first

> establish a prima facie case by "mak[ing] a modest showing that a member of a statutorily protected class was not offered the same terms, conditions or privileges of a rental of a dwelling or not provided the same services or facilities in connection therewith made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination."

*Id.* (alteration in original) (quoting *Khalil v. Farash Corp.*, 260 F. Supp. 2d 582, 588 (W.D.N.Y. 2003)). If a plaintiff successfully makes this showing, "the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (quoting *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)). At that point, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual." *Id.*

The record here contains no direct evidence of discrimination, such as emails or other documents in which Defendants have explicitly betrayed race-based animus. Nor does it contain indirect evidence from which a reasonable juror could infer that Defendants treated the Reeds any differently than they treated tenants of other races.

To begin with, the only documents the Reeds have introduced into the summary judgment record—and, per Judge Gorenstein's preclusion order, the only documents the Reeds would be permitted to produce at trial (*see* Dkt. No. 180)—consist of photographs of the apartment at issue (*see, e.g.*, Dkt. No. 20 at 7–8; Dkt. No. 165 at 5–8), evidence that the apartment was under rent control in 2010–2011 (Dkt. No. 20 at 10–11), personal identification

documents (*see, e.g.*, Dkt. No. 20 at 12), and various submissions that connect the Reeds with the apartment's address (*see, e.g.*, Dkt. No. 20 at 13–17; Dkt. No. 165 at 3–4; Dkt. No. 179 at 2–6). While these documents could, generously viewed, perhaps be probative of the apartment's condition or the justice of the Reeds' eviction, they do not suggest that tenants of other races were treated better than the Reeds were.

Nor does the record suggest that witness testimony could fill this gap. At his deposition, Marques Reed indicated that he had never spoken with the only named witnesses he and his mother had identified—Al Sharpton and Charles Rangel (Dkt. Nos. 163–64)—and that he was unsure of the substance of any conversations his mother may have had with them (Dkt. No. 243-26 at 73:20–75:18). And as for the unnamed witnesses the Reeds have identified—various neighbors, a woman with dreadlocks with whom Marques Reed spoke at housing court, a superintendent, and a worker who took the Reeds' keys when they vacated the apartment—nothing in the record suggests that they would corroborate the Reeds' discrimination claims even if it were possible to identify them or appropriate to seek them out at this late juncture, past the close of discovery. (Dkt. Nos. 163–64; Dkt. No. 243-26 at 36:3–40:7, 69:6–73:19.)

This leaves Marques Reed's own deposition testimony, in which he professed his belief that Defendants had treated him and his mother "differently because [they were] black as opposed to what [Defendants] would have done" if he and his mother had been white. (Dkt. No. 243-26 at 84:18–23.) While the Court has no doubt about the sincerity of Marques Reed's belief, "general reliance on conclusory allegations and speculation is insufficient to overcome summary judgment." *Sandia v. Wal-Mart Stores, E. LP*, 699 F. App'x 64, 65 (2d Cir. 2017) (summary order). Here, Marques Reed has testified that his suspicions of discrimination arose as a result of his belief that the apartments of two white tenants were being remodeled while his own was in

disrepair. (Dkt. No. 243-26 at 84:25–87:17.) This sort of allegation may perhaps suffice at the pleading stage, but the summary judgment record contains no evidence about the two white tenants, the work that was done on their apartments, and whether it was Defendants—rather than the tenants themselves—who arranged for the work to be done. Indeed, Marques Reed admitted that he could not recall having seen the interiors of these two supposed comparator apartments since the 1980s. (Dkt. No. 243-26 at 87:19–88:12.) Without more evidentiary meat on the bones, these allegations alone cannot fend off summary judgment.[7]

Ultimately, then, the Reeds have not come forward with evidence sufficient to make out a legally adequate *prima facie* showing of disparate treatment. The Court acknowledges the sad reality that, as the Reeds have consistently pointed out (*see, e.g.*, Dkt. Nos. 102, 200), racial injustices have plagued and continue to plague this country. But absent an evidentiary basis for inferring that such an injustice occurred here, Defendants are entitled to summary judgment on the Reeds' disparate-treatment claim.

**B.      Disparate Impact**

To make out a prima facie case under a disparate-impact theory, "[a] plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *McCulloch v. Town of Milan*, 559 F. App'x 96, 99 (2d Cir. 2014) (summary order) (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294

---

[7] In his response to Defendants' statement of undisputed material facts, Marques Reed also represents that "the population of the building" where he had lived with his mother "was generally increasing in white tenants and decreasing in tenants of color." (Dkt. No. 252 at 5.) To the extent that this statement was intended to offer an additional basis for an inference that Defendants acted with discriminatory animus against the Reeds during their tenancy, the Court notes that the record contains no evidence, such as rental records or sworn testimony, that sheds any light on how or why the building's demographic makeup might be changing.

9

F.3d 35, 52–53 (2d Cir. 2002)). To the extent that the Reeds intended to raise a disparate-impact claim by alleging that their experiences were typical of the way Defendants "ha[d] been doing business with black people for years" (Compl. ¶ 24), Defendants are entitled to summary judgment on this claim as well. The evidence in the record is "particular to [the Reeds]," and there is no indication that any of the ill treatment the Reeds allege to have suffered resulted from the application of a broadly applicable, "outwardly neutral practice[]," let alone a practice that had a "significantly adverse or disproportionate impact" on people of color. *McCulloch*, 559 F. App'x at 99 (second and third quoting *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 53).

### IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 241 and to close this case.

SO ORDERED.

Dated: March 28, 2019
New York, New York

                                                                                     _____
                                                                                     J. PAUL OETKEN
                                                                                     United States District Judge

*COPY MAILED TO PRO SE PARTY BY CHAMBERS*